In the Matter of JACK HAINES, Petitioner, v ROBERT F. FLACKE, as Commissioner of the Department of Environmental Conservation of the State of New York, et al., Respondents.

Second Department, November 5, 1984

APPEARANCES OF COUNSEL

*Rebore & Thorpe, P. C.* (*Irving Like* and *Paul W. Thorpe* of counsel), for petitioner.

*Robert Abrams, Attorney-General* (*Beryl Kuder* of counsel), for respondents.

### OPINION OF THE COURT

*Per Curiam.*

The subject of this proceeding is a single vacant undeveloped lot located at Captree Island in the Town of Babylon, County of Suffolk. The property is designated as lot 32 on the map of Captree Island, filed in the clerk's office of the Town of Babylon on October 1, 1957. There are 32 lots shown on that map.

The Town of Babylon owns all of the 32 lots on Captree Island, but leases them out. Petitioner entered into a lease of lot 32, with the town as landlord, on November 28, 1977. The lease term runs from January 1, 1977 to December 31, 2001.

The lease requires the tenant to pay the following annual rentals:

| | |
|---|---|
| January 1, 1977 to December 31, 1977 | $150 |
| January 1, 1978 to December 31, 1981 | 175 |
| January 1, 1982 to December 31, 1986 | 200 |
| January 1, 1987 to December 31, 1991 | 225 |
| January 1, 1992 to December 31, 1996 | 250 |
| January 1, 1997 to December 31, 2001 | 275 |

The lease entitles petitioner, as tenant, to erect and occupy one single private one-family dwelling with garage on lot 32, and for no other purpose whatsoever. All of the lots shown on the filed map have been developed with one-family dwellings except lot 32.

The past history of the Town of Babylon for a period of 50 to 60 years has been one of regular renewals of the leases on the barrier beaches, including Captree Island. The town intends to offer to sell and convey fee title to its lessees on Captree Island. Upon receipt of such offer, petitioner intends to accept, and to purchase and acquire title to lot 32. The land leased by petitioner, "as added by an additional section of the lease", is 32,500 square feet. The other 31 lots on the map are all 100 feet by 200 feet in size (20,000 square feet area).

Petitioner's land contains tidal wetlands, and is thus subject to ECL article 25 (Tidal Wetlands Act) and the regulations issued thereunder. Those regulations (6 NYCRR 661.6 [a]) include requirements that the minimum setback of all principal buildings that are in excess of 100 square feet (with certain types of structures excluded) "shall be 75 feet landward from the most landward edge of any tidal wetland" (6 NYCRR 661.6 [a] [1]). However, that regulation also states that it is: "Further provided, where numerous and substantially all structures which are (i) of the type proposed by the applicant, (ii) lawfully existing on the effective date of this Part, and (iii) within 500 feet of the subject property, are located closer to the subject tidal wetland than the minimum setback required by this paragraph, placement of a structure as close as the average setback of these existing structures from the subject tidal wetland shall fulfill the requirements of this paragraph."

The regulations further provide that "[t]he minimum setback of any onsite sewage disposal septic tank, cesspool, leach field or seepage pit shall be 100 feet landward from the most landward edge of any tidal wetland" (6 NYCRR 661.6 [a] [2]).

Finally, it is provided that "[t]he minimum lot area for any principal building constructed within the area regulated by this Part, which minimum lot area shall include any wetland portion and any adjacent portion of such lot, shall be * * * 40,000 square feet where such principal building will not be served by a public or community sewage disposal system" (6 NYCRR 661.6 [a] [5]).

Petitioner applied to the Department of Environmental Conservation (DEC) for appropriate permits and any necessary variances to allow him to excavate, place fill, grade and construct a dwelling and a septic tank system on the subject site. At the public hearings conducted on petitioner's permit applications, the parties presented testimonial and documentary evidence bearing upon the core issues, viz., the location of the tidal wetlands boundary, the impact of petitioner's proposed house and sanitary system upon the wetlands, and whether petitioner should be granted the permits, either as a matter of right or by way of variances.

For the petitioner, Professor Robert W. Johnson, an environmental expert, testified that the tidal wetlands-uplands boundary was reflected on petitioner's exhibit 9, a survey and sketch of the property. He had located that boundary on the basis of changes in elevation and vegetation. He indicated where the area of the uplands is on exhibit 9. He testified that the southeasterly quarter of petitioner's property — about 8,000 square

feet — is wetlands. His wetlands classification for the parcel was "High marsh". He asserted that petitioner would build his house "on the upland portion of the property, along the tidal wetlands border". The proposed house "comes close to the wetland border but it doesn't really intrude on it". The location of the house would be consistent with the DEC's land use regulations in 6 NYCRR part 661 "even though it will be impossible to meet the 75 foot [building] setback line". He stated, however, that the other houses on the island within 500 feet of petitioner's property are all less than 75 feet from the tidal wetlands boundary.

Also called as a witness for the petitioner, Bruce D'Abramo, a civil engineer and expert in sanitary systems, testified that the sanitary system proposed by petitioner "is an unconventional one" in that "[u]nlike standard systems throughout the county * * * which employ an anaerobic decomposition in septic tanks, this system would employ aerobic decomposition" and would not have an adverse impact on the wetlands. D'Abramo testified that the quantity of nitrates released from systems of standard design are 50% higher than would be released "from this advanced on-site treatment". Further, petitioner's system would remove and dissolve metals commonly found in waste water.

D'Abramo testified that, based on petitioner's version of the tidal wetlands boundary, "[t]he nearest point on the Applicant's property that the sanitary system would be to the tidal wetlands is sixty feet", but that the distance from the DEC's version of the tidal wetlands boundary to the sanitary system is "about ten feet". We have noted that the regulations require a 100-foot sanitary system setback. In this connection, Professor Johnson testified that "[t]he more serious problem" with petitioner's permit application is not the building setback problem but the question of the "septic intrusion", which he thought would be controllable by means of the aerobic sanitary system described by D'Abramo.

Although petitioner's evidence was that the proposed house would be "along the tidal wetlands border" or "close to" that border, and that the sanitary system would be about 60 feet from that border, the DEC's estimates were in sharp conflict with that of petitioner. The DEC version of the tidal wetlands boundary is shown on survey sketch marked DEC exhibit 12. On that exhibit, the blue line depicting the tidal wetlands boundary (DEC version) runs *through* the proposed house. Charles T. Hamilton of the DEC testified that the proposed sanitary system would be "directly on or directly adjacent to" the DEC tidal wetlands boundary. Hamilton conceded that it is possible to

move the proposed septic system further to the west within the uplands portion of the subject property, but asserted that this would put it closer to wetlands on the west side of the property. Further, DEC witness Michael J. Fiscina was critical of petitioner's proposed septic system. Among those criticisms was the following:

"Well, this type of system where you have an aeration arrangement to introduce oxygen to denitrify the sewage, the only effect you are going to have on the sewage is removing, the breaking down of ammonia into nitrates and nitrites. It has no other effect on the sewage.

"Whenever that pump shuts off, it will start cooking in an anaerobic condition. Unless you are virtually continually jetting air through the sewage, an anaerobic condition will result, and then when that pump kicks on again, whether it be off for a few hours, a few weeks or few months, you will be introducing hydrogen sulfide and methane gas to the atmosphere, which are poisonous substances and very abnoxious [*sic*] to the human sensibilities".

The parties' estimates of the value of the wetlands on the subject site contradicted with each other.

The core of the administrative law judge's posthearing report was that "the wetlands boundary line established by [DEC] Staff, consistent with statutory criteria, must be considered as the proper boundary line on the Site"; that petitioner could not meet the 75-foot house setback requirement and the 100-foot septic system requirement; that the variances needed would be "extraordinary"; that the proposed house would encroach some 40 feet into high marsh area and would thus require a 115-foot variance to the 75-foot setback requirement; that the existing houses within 500 feet of the site are set back an average of 15 feet from the wetlands; and that the proposed sanitary system would have a zero setback from the tidal wetlands boundary and would thus require a 100-foot variance to the 100-foot septic system setback requirement. He concluded that the site "consists in major part of good productive wetlands"; and that among the reasons for denial of the requested permit are the "extraordinary" extent of the variances that would be required and that the project is "not reasonable" and "is not necessary". He excused petitioner, however, from the 40,000 square-foot area minimum required for the principal building, on the ground that petitioner is entitled to "grandfather" protection since the site was in existence as a single-family homesite on a map filed before the regulations took effect.

On June 15, 1982, the Commissioner adopted the administrative law judge's hearing report and denied the requested permit. This proceeding ensued.

In this proceeding, petitioner argues, *inter alia,* that the administrative law judge prepared and utilized what, in effect, was his personal nonexhibit map composite (Appendix C) of petitioner's exhibit 9 and DEC's exhibit 12;[1] that DEC exhibit 12 erroneously depicted and located Professor Johnson's tidal wetlands boundary; and that therefore the administrative law judge's Appendix C incorporated and erroneously relied on that erroneous DEC depiction.

■ We find no basis here for disturbing the determination under review, however, because the administrative law judge had before him the *original* boundary depictions of petitioner (exhibit 9) and of the DEC (exhibit 12). The DEC's evidence provided substantial evidence for the denial of petitioner's applications, and even on *petitioner's* evidence alone there was substantial evidence to support that denial.

Petitioner further argues that the administrative law judge relied upon matters outside the evidentiary record; that the tidal wetlands regulations were erroneously interpreted and arbitrarily applied to deny the requested variances; that the DEC erred in classifying the subject property as "high marsh" and not "adjacent area"; and that the DEC erred in not granting the requested 75-foot setback variance for the proposed house and in not granting the requested 100-foot setback variance for the proposed sanitary system.

We find no merit to these contentions. The permit determination under review had a rational basis and was supported by substantial evidence on all of these issues (see *Spears v Berle,* 48 NY2d 254, 261). Moreover, it is well settled that the construction given statutes and regulations by the agency responsible for their administration, if not irrational and unreasonable, should be upheld (see *Matter of Bernstein v Toia,* 43 NY2d 437; 2 NY Jur 2d, Administrative Law, §§ 77-83).

Petitioner's final contention, however, is that, pursuant to the determination in *Spears v Berle* (*supra,* p 261), if this court determines that the DEC did not err in denying the requested permits, the court should direct that an evidentiary hearing be held to determine whether the DEC's denial of such permits constituted an unconstitutional taking of petitioner's property.

---

1. The hearing transcript indicated that exhibits 9 and 12 contained color markings. Since these exhibits were printed in black and white, this court called for and examined the original exhibits.

ECL 25-0404 provides:

"§ 25-0404. Judicial review

"Any person aggrieved by the issuance, denial, suspension, or revocation of a permit may within thirty days from the date of the commissioner's order seek judicial review pursuant to article seventy-eight of the civil practice law and rules in the supreme court for the county in which the tidal wetlands affected are located. *In the event that the court may find* that the determination of the commissioner constitutes the equivalent of a taking without compensation, and the land so regulated otherwise meets the interests and objectives of this act, it may, at the election of the commissioner, either set aside the order or require the commissioner to acquire the tidal wetlands or such rights in them as have been taken, proceeding under the power of eminent domain" (emphasis supplied).

Thus, it can be seen that when a court finds that the denial of a permit is rational and supported by substantial evidence, a petitioner must cross a bridge to obtain a hearing on the issue of confiscation. A petitioner is not provided with automatic passage across that bridge (see *Spears v Berle, supra,* p 261). ECL 25-0404 does not specify the criteria and forum for obtaining a hearing on confiscation.

At the hearings before the administrative law judge, the parties clashed as to whether evidence on the eminent domain issue was appropriate, and, if so, the degree to which such evidence could be placed in the record of a hearing involving permit applications. At the inception of the hearing, petitioner's attorney presented a brief which addressed the issue of taking. Further, he stated that "I make the tender of such evidence should your Honor wish to receive this as part of a hearing on this issue". DEC's counsel objected and asserted that the forum for that issue is the New York State Supreme Court. The administrative law judge sustained the DEC objection to receiving evidence on the taking issue at the administrative hearing. However, later, during the course of the hearing, petitioner's witness D'Abramo was permitted to testify that the zoning of the subject property is "B residence" (primarily single-family residence) and that if the requested permits were denied "there would not be any [use of the property for any] beneficial purpose that would be in keeping with the Town of Babylon zoning ordinances and the Tidal Wetlands Land Use Regulations".

In his "Fourth Cause of Action", petitioner asks: "that if upon judicial review pursuant to CPLR Sections 7803 and 7804, the Respondent's [*sic*] decision is sustained; (1) that the Court direct

Respondent [*sic*] to either issue a Tidal Wetland Permit to Petitioner, or institute condemnation proceedings to acquire and pay just compensation to Petitioner for the taking of Petitioner's property, pursuant to ECL Section 25-0404; (2) that the Court direct Respondent [*sic*] to hold an evidentiary hearing for the purpose of receiving testimony and evidence bearing on the taking issue". It should be emphasized that the "Fourth Cause of Action" asks the court to direct that respondents hold a hearing on the taking issue.

■ In our opinion, petitioner *is* entitled on this record to a hearing before Special Term on the confiscation issue. The proper practice is to assert such claim in the proceeding seeking judicial review and to buttress that claim with a supporting affidavit outlining the basis for the confiscation claim. It is obvious that an administrative hearing is not a suitable forum for that issue, because the determinations there must be based merely on substantial evidence and have a rational basis (*Spears v Berle,* 48 NY2d 254, 261, *supra*). Patently, a determination on the issue of confiscation cannot be made merely on the basis of substantial evidence, and cannot be made by an administrative hearing officer. The burden of proof is far heavier. Thus, as stated in *Matter of National Merritt v Weist* (41 NY2d 438, 445): "At the outset, it should be emphasized that when we deal with a challenge to the constitutionality of an ordinance as applied to a particular piece of property, the burden is entirely upon the challenger to demonstrate beyond a reasonable doubt that the property will not yield a reasonable return under any of the uses permitted by the zoning ordinance (1 Anderson, NY Zoning Law and Practice [2d ed], § 2.09, pp 48-52)".

Therefore, the evidence on the confiscation issue must be presented to Special Term. The parties should brief for that court's consideration and determination various issues that arise in connection with the alleged confiscation but which are not ripe for this appellate court's determination in view of the limited record and issues before us.

Among the questions to be considered are the significance and effect of the following: (1) The party claiming confiscation (petitioner) is a lessee and not a fee owner (see 2 Nichols, Eminent Domain [3d ed], § 5.06 ["Term of Years (Leasehold)"]; 4 Nichols, Eminent Domain [3d ed], § 12.42 ["Leased Property"]); (2) The fee owner (Town of Babylon) is not a party to these proceedings; (3) The significance, if any, of the amounts of annual rent payable by the lessee; (4) The lessee's claim that he will be afforded the right to purchase the leased property and will, in

fact, purchase it; (5) A clause in the lease (paragraph 15)[2] purporting to govern the rights of the lessor and lessee should there be a taking by eminent domain; and (6) The alleged taking claimed by the petitioner is not a formal taking instituted by a condemnor but a constructive taking based on application of and the effect of environmental statutes and regulations on the subject property.

A concluding caveat is in order concerning Special Term's transfer of this proceeding to this appellate court. CPLR 7803 provides that the "only questions that may be raised" in a proceeding pursuant to CPLR article 78 include: "4. whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence".

CPLR 7804 (subd [g]) provides: "(g) Hearing and determination; transfer to appellate division. Where an issue specified in question four of section 7803 is not raised, the court in which the proceeding is commenced shall itself dispose of the issues in the proceeding. Where such an issue is raised, the court shall make an order directing that the proceeding be transferred for disposition to a term of the appellate division held within the judicial department embracing the county in which the proceeding was commenced; the court may, however, itself pass on objections in point of law. When the proceeding comes before it, whether by appeal or transfer, the appellate division shall dispose of all issues in the proceeding, or, if the papers are insufficient, it may remit the proceeding".

At bar, Special Term transferred the proceeding to this court for review. However, the authorization for review is ECL 25-0404, the provisions of which were previously noted. In *Spears v Berle* (48 NY2d 254, 261, *supra*) (a fresh water wetlands case), the Court of Appeals commented with respect to ECL-authorized review pursuant to article 78: "A proceeding by a wetlands owner under section 24-0705 (subd 7) is somewhat novel and possesses a dual nature. First, the reviewing court must determine whether the denial of the permit had a rational basis and was supported by substantial evidence (cf. *Matter of Fuhst v Foley,* 45 NY2d 441, 444; *Matter of Cowan v Kern,* 41 NY2d 591, 598-599). If the administrative decision is sustained, it then

---

**2.** "If the whole or any part of demised premises shall be taken or condemned by any competent authority for any public or quasi public use or purpose, then, and in that event, the term of his lease shall cease and terminate from the date when the possession of the part so taken shall be required for such use or purpose, and without apportionment of the award. The current rental, however, shall in any such case be apportioned".

becomes necessary to evaluate whether the wetlands regulations, considered together with the denial of the permit, would work an unconstitutional taking of petitioner's property. For the latter aspect of the proceeding, there must be an evidentiary hearing at which the landowner and the State may produce expert testimony and other evidence bearing upon the regulation's effect on the value of the subject parcel (see, e.g., *Matter of Charles v Diamond,* 41 NY2d 318, 326-328). It is only after such a hearing that the extent of the financial hardship, if any, may be meaningfully assessed".

It is manifest that where the proceeding is transferred to an Appellate Division — as it was at bar — and that appellate court reviews the record and holds that a denial of a permit was rational and supported by substantial evidence, the appellate court will not have before it a proper evidentiary record on the confiscation issue and cannot readily hold an evidentiary hearing on that issue, should the petition and supporting papers warrant it. In such a case, the appellate court must remit the proceeding to Special Term for a review of the confiscation allegations, and an evidentiary hearing on that issue. Thereafter, the record of nisi prius on the confiscation issue is subject to being returned to the Appellate Division. Thus, the initial threshold transfer by Special Term of the proceedings to this appellate court pursuant to CPLR 7804 (subd [g]) results in a great delay, and a duplicative and inefficient procedure. Further, were the review pursuant to ECL 25-0404 accomplished by Special Term in the first instance, that court could determine both the questions of whether the denial of the permit should be sustained, and if the answer to that question was affirmative, whether a confiscation hearing is warranted. It could then hold such a hearing and render a determination on the confiscation question. Thereafter, should there be an appeal, the appellate court would have the benefit of initial findings and determinations cn the issue of whether the permit denial was rational and based upon substantial evidence, and whether that denial resulted in a confiscation, requiring a direction that the Commissioner either set aside his determination or acquire title under the power of eminent domain.

The procedures we have outlined will furnish a proper, full record, place the issues in sharp focus and avoid delay and inefficient review procedures.

Certain exceptions exist to the general scheme provided by CPLR 7804 for division of jurisdiction between Special Term and the Appellate Division over judicial review of administrative

determinations. Such exceptions are the product of statutes and regulations outside the CPLR (see, e.g., Town Law, § 267, subd 7; General City Law, § 82, subd 1, par [c]; Village Law, § 7-712, subd 3).

Although the ECL does not contain the same language as the aforecited statutes expressly authorizing Special Term to initially retain and determine the substantial evidence issue (as well as the confiscation issue), authorization and the necessity for that authorization is implicit in the ECL and in *Spears* (*supra*). ECL 25-0404 ("Judicial review") specifically provides for an article 78 review "in the supreme court for the county in which the tidal wetlands affected are located" and then goes on to state that "[i]n the event that the court may find that the determination of the commissioner constitutes the equivalent of a taking without compensation", specified action may then be taken. It is manifest that since the Appellate Division initially will not have before it a proper evidentiary record on the confiscation issue, the Appellate Division is initially not "the court" which, after review of the substantial evidence issue, proceeds to the confiscation issue (compare *Matter of Chase Manhattan Bank v New York State Dept. of Environmental Conservation*, 66 AD2d 779, with *Spears v Berle*, 48 NY2d 254, *supra*).

This interpretation is supported by language in *Spears v Berle* (*supra*, p 261), to wit, "A proceeding by a wetlands owner under section 24-0705 (subd 7) is somewhat *novel* and possesses a *dual* nature" (emphasis supplied) and ensuing comments, quoted *supra*, with respect to the novel and dual nature of the review proceeding.

The procedures provided for by this court are thus authorized and required by both the letter and spirit of ECL 25-0404 and *Spears v Berle* (*supra*). Accordingly, in future proceedings authorized by ECL 25-0404, Special Term should follow the procedures which we have outlined, absent unusual circumstances, which if extant, should be recited in the record.

LAZER, J. P., MANGANO, NIEHOFF and BOYERS, JJ., concur.

Determination of the Commissioner of the Department of Environmental Conservation dated June 15, 1982, confirmed, on the merits, without costs or disbursements, and matter remitted to Special Term for an evidentiary hearing pursuant to *Spears v Berle* (48 NY2d 254, 261) to determine "whether the wetlands regulations, considered together with the denial of the permit[s], would work an unconstitutional taking of petitioner's property."